Case number 22-2376 from Western Missouri, Nancy Avina v. Union Pacific Railroad. Mr. Myers, whenever you're ready. Good morning. May it please the Court. Your Honor, appellant Nancy Avina appeals from a pair of erroneous rulings that denied her the right to submit her claims of age and race discrimination to a jury. We submit that the resolution of this appeal boils down to a single question that is a two-part question. Does the evidence viewed entirely in Ms. Avina's favor as the standard of view requires make out a submissible case of discrimination against the defendant railroad? And does it do so in a way that does not require the Court to interpret the collective bargaining agreement? I submit the answer to both questions is yes. And the reason we know the answer to both questions is yes is because the district court itself so ruled in response to or in ruling upon Union Pacific's motion for summary judgment. She analyzed the evidence. She held this evidence makes out a factual case for the jury. And not once did she go to or consult or refer to the collective bargaining agreement. Now, where the case went off the rails, if the Court will excuse the metaphor, is on the fourth day of trial evidence, the defendant raised for the first time the issue of preemption. The defendant did so because there had been a lot of questioning about the collective bargaining agreement. Hey, we're talking about this a lot. We think it's preempted. Briefing was hurried and rushed. That was on a Friday. The judge gave us the weekend to brief it. It was argued Monday. It was argued again a couple days later. And I think, frankly, in the fluster, in the hurry, in the last minute, the judge simply made the wrong decision. She got caught up in this erroneous analysis that we've talked about the collective bargaining agreement a lot. Therefore, the resolution of the case must turn upon its interpretation. And that's simply not the case, as we have addressed in the brief. So that was the main mistake that she made. And in argument, multiple times did I point out this court's law, case law, it's also in the Supreme Court's jurisprudence, that for there to be a dispute, for there to be preemption, there has to be a dispute about a specific provision. And I kept saying, what's the provision? What is it that they say is the provision that is in dispute and that requires this court to interpret it? And the defendant never did address that question directly. There was a vague reference to Rule 11, but never did it say, it's this provision, and here's why it's in dispute, because they say X and we say Y. So over and over we raised that. Our arguments were unavailing, and the district court granted the motion verbally, so those claims did not go to the jury. We were left with a separate claim that was a non-collective bargaining unit claim that went to the jury and resulted in a mistrial. The jury hung, and so the court said, well, we'll have to reset the case for trial. And so we took advantage of that opportunity to file a motion under Rule 54B and ask the court to reconsider the admittedly hurried in-trial ruling about preemption. And the court did so, and that order is the order that's under appeal. It's the May 11 order where she addresses a lot of the arguments that we've made. And in that argument, in our Rule 54 motion, we again said, what's the provision? What are they saying is in dispute? Defendant never did address it there. I submit they haven't addressed it before this court. But the court, in its May 11 order, undertook to say, well, let me see if I can identify the provisions that are in dispute and that have to be resolved in order to decide plaintiff's claim of discrimination. And she did that on pages, I think, 11 and 12 of her ruling, and they're just factually wrong. The first thing she said is this language about who's the decision maker, well, I'm sorry, that's the second one. The first thing is this language about what does on-file and duplicate mean. And I'm reading from page 11 on to page 12 of her order. She says, referring to this language, did defendant require, then there's a parenthetical, or could defendant require, submission of the application through ITRAC force? Well, the first question, did defendant require submission of the application through ITRAC force, is a purely factual question. And we said that over and over and over again. The jury has to decide that. The only evidence in the case about what was required were these two documents that were admitted in evidence, Exhibit 97, which was the 2017 bulletin. This is for the same position that was filled and then went vacant and was refilled the following year, and then Exhibit 91. And both bulletins say what is necessary. On Exhibit 97, it says on page 1, if you want to apply, send your email to Samantha Miller. And it says on page 2, you can also fax it to her. There's her fax number. Well, let me ask you this. So we've got Rule 11. And one of the elements of a failure to promote claim is to actually apply for the promotion. You've got to do that. That's an element of the claim for all the claims that are here, all the discrimination claims. But then Rule 11 sets out a specific requirement, I guess, for whether or not you've applied. And at trial, it seems to me, just reading the transcript, that there's a lot of discussion. Did you actually apply for this position? Is ITRAC an appropriate way to do it? Or can you send it to the person who posted it? What is the appropriate way to apply? It seems to me that just from that simple description, how to apply is governed by the collective bargaining agreement. Why is that not true here? Well, factually, here's the sequence of events, Your Honor. The collective bargaining agreement we're talking about was enacted in 2006. ITRAC admittedly did not exist. So in reviewing the agreement, you can't read anything into or out of it about ITRAC force. That didn't exist at the time the agreement was adopted. It was adopted three years later in 2009. So years later, they adopt this ITRAC force. And our evidence, the evidence that the court was required to accept as true and disregard defendant's evidence except that which the jury was required to believe, was that ITRAC force could only be used for seniority-based positions. When you went on to the thing, if you clicked on a seniority-based position, it would give you the description, much like what we see in this bulletin. Here's what the job duties are here, the requirements, and so forth. And there was a submit button where you would click the button, and that would send your application off to whoever on the other end of cyberspace gets it, and you would get a confirmation number. Our testimony at trial was that system didn't work for these non-seniority, these right of selection positions. But isn't there testimony that it did work for some people? Since it appears no one disputes that the five people that actually applied through the ITRAC system actually applied through the ITRAC system. We do dispute that, Judge. That's their evidence that the jury, that the court was required to disbelieve. That's not evidence the jury was required to believe. It's oral testimony. Our evidence was from Cantrell Robinson. I tried to apply that way, and when you open up the right of selection position, there's no submit button. It gives you this instruction, send a fax. And so that's what I did. I sent a fax. All of the testimony about, no, no, no, ITRAC force, that is one witness testified to that, Cindy Wood, and then their manager said that's the way it worked. They didn't produce a single piece of paper that said this is how it works. And our evidence, if the jury accepted it, was it's not only not required, it's not even possible to do that. Well, it sounds to me, though, that you're setting up a factual dispute here, but underlying that factual dispute is the idea that for senior level positions you use one thing, and for other types of positions you use something else, and you're still going back to Rule 11 to figure out what does the collective bargaining agreement actually require for applying for a position. Aren't you? Well, I don't think so, Judge. What we went to Rule 11 to point to the jury is that what Rule 11 says is that the way you do this is you issue a bulletin, and that's what Exhibits 91 and 97 are. They are bulletins. So all that Rule 11 said, you can put whatever you want, and we told the judge over and over, look, they could have put in here you have to go through ITRAC force, they could have put any number of hoops that they had to jump through, but what they did put in there was you have to send your resume. That's the only requirement. So their document, our testimony is we did that. We have testimony, but no documents from the defendant saying something different under Dace and Reeves. That's evidence the jury is not required to believe. It's not from disinterested witnesses. It's from the defendant. Was there testimony or evidence that a bulletin for, I think what you're calling seniority positions, actually said not fax or send, but said apply through ITRAC force? Judge, we didn't have a bulletin, and I asked that very question. I was a late entry to the case. We did not have in discovery any bulletins for non-seniority-based positions. But there was no dispute. All of the parties agreed that in the case of a seniority-based position, you could go to ITRAC, you could open it up, you could submit it. It wasn't even actually required that you go through that. Their testimony was that you could also phone it in. If you were a non-computer literate person, you could phone it. Well, in your exhibit there that you've been referring to, which is the bulletin, correct? Yes, Your Honor. If that bulletin looked the exact same way for seniority positions, and it didn't say go to ITRAC force to apply, then aren't we kicking into sort of a past practice or a practice of how it actually works that nobody's told in the bulletin that you go to ITRAC force, but that's just the practice that has been developed under the CBA? I agree with that, Judge. As to the seniority-based positions, there's no question that practice had developed. The evidence as to, and we point this out in our reply brief, as to the non-seniority-based position, there was no past practice. The last time that a right of selection position had been opened was a 2008 position, so a year before the implementation of ITRAC. A position that Nancy Avena applied for, not using ITRAC, didn't exist. That position was then held for the next nine years by this lady named Kim Peterson, who was disqualified creating the opening. So this 2017 position is the very first time there is a right of selection position open up. Can I ask a follow-up question about the difference between the right of— I mean, I understand the basic difference between right of selection and seniority, but why are you making a distinction between the two for purposes of the bulletin process? Because it seemed to me that the CBA said, okay, well, there's this one— the right of selection cases are different only in this one little way. Otherwise, they're still bulleted in the same way under Rule 11. So why are we distinguishing between right of selection positions and seniority positions once you land in Rule 11 of the CBA? Well, the only reason that I can see that they're treating them differently under ITRAC for us, and this was the defendant's evidence, not our evidence, is Jacob Langle, the ITRAC expert that they called who testified during our case, said it is not possible using ITRAC for us to submit a resume. You can click that you want this button, and they know your seniority. They know your quality. They just—you either get the job or you don't, depending on whether it's your seniority. But on right of selection, you're submitting additional information so that they can use to determine your qualifications. That can't be done through ITRAC for us. That's undisputed. That's their evidence. And so it makes perfect sense to say, okay, on right of selection, just fax or email your resume because that's what we really need to make the selection. All right. Now, getting back to what the district court did when she looked at these positions, so she said that that was a purely factual question, and the other half of it could defendant require submission. Again, we conceded that they could have. If they'd have put that in the bulletin, we'd have followed those instructions as well. The second thing that she says is that there's a dispute that has to be resolved by the reference to the CBA in that is it the head of the department that makes the selection or is it a panel of interviewers? Well, the judge overlooked, but at the transcript, at page 282, we asked those questions of Craig Miller, and he said, and I'm quoting from line 13 of page 282 of the court reporter's pagination, as the head of the department, you chose her to put in that position, referencing Kim Peterson back in 2008. Correct. Just like Jen Peters was going to choose who to put in this position, referring to the 2018 position. Answer, correct. And Samantha Miller chose who went into the 2017 position. Answer, yes. So we're entitled to the benefit of that testimony. The fact that there was other evidence, he admittedly did at another part of the transcript say, well, we have interviews, everybody gives scores, we add the scores up, and that determines the selection. There was no documentation of that. They couldn't even remember the names of the interviewees. So this was a purely classic factual situation for the jury. We had a plaintiff who, by her own testimony and the judge's admission on summary judgment, applied for the position. She was qualified. There was no dispute about that, none at all. I mean, they acknowledged it. An arguably unqualified and certainly lesser qualified person got the job, and there's no reasonable explanation. It's a fact issue for the jury. It should have been submitted. Thank you. Mr. Rolfes. Good morning. May it please the Court, Andrew Rolfes for Union Pacific Railroad Company. From Union Pacific's perspective, this is a pretty straightforward case. There's no disagreement about the legal standard that applies in this case, and in our view requires that the district court's decision be affirmed. As counsel acknowledged, if Nancy Avena's claims that she was improperly denied a promotion because of her race and age require the interpretation and application of a provision in the collective bargaining agreement between Union Pacific and her union, then those claims are precluded by the mandatory and exclusive dispute resolution procedures under the Railway Labor Act. The evidence and the questioning and the argument that was presented to the district court in this case made clear that Ms. Avena's claims require the interpretation and application of the provisions in the collective bargaining agreement, Rule 11, that govern the bidding and application process, including the established practices under that provision. And that last point is important, and I think that's where this case really gets decided. It's black-letter law under the RLA that a collective bargaining agreement includes not only the written terms of the agreement, and this agreement, as counsel acknowledged, was negotiated in 2006, but also the established practices under that collective bargaining agreement that then become implied terms of the agreement. And it's our position that the use of ITRAC force for the bidding and application process became an implied term of the agreement starting in 2009. And as to the seniority-based positions that have come open since then, that is undisputed. So there is an established past practice regarding the use of ITRAC force. And counsel's correct. It's not in the collective bargaining agreement. But the cases, there are legions of cases under the RLA that talk about implied terms and past practices that don't require those terms to be written out in the collective bargaining agreement. That's why they're called implied terms. So the lead case on that would probably be the Supreme Court's Conrail decision. In Conrail, the collective bargaining agreement wasn't even part of the record. And that case involved Conrail's unilateral addition of drug testing to its periodic and return-to-work physicals. Prior to that, those physicals had only included urinalysis for blood sugar and albumin. And on occasion, for cause, they would include drug testing. When the company implemented that for all return-to-work and periodic physicals, the unions cried foul, filed suit, and said, this is qualitatively different than what your practice had been. The Supreme Court said, that's a minor dispute. We don't get into weighing those competing arguments. As long as there's a basis for the carrier to assert that this is our practice, that has to be decided in arbitration. This court has decided the very same thing. In the Brotherhood of Railroad Carmen case versus Missouri Pacific that we cite in the brief, there was a dispute about a number of railroads leasing of trackage to a third party, TTX, which is a freight car pooling company owned by all the carriers, to TTX to allow them to use trackage in various yards to make repairs. Again, the unions cry foul, say you can't do that, and put on evidence that the practice prior to then had been that the only time you used, you leased trackage to TTX to make these kind of repairs was for refrigerator cars that the Carmen didn't work on or Amtrak passenger cars that the Carmen didn't work on. They said, now you're taking our work. This court said, weighing those things, that's a job for arbitration. And importantly, that case also included a state law tortious interference claim. And the court said the same thing as to that claim. We look at that, says it's preempted because in the event that an arbitrator ruled in the railroad's favor, there would be no basis for saying that there was a tortious interference with the union's business expectation. So let me address very briefly the contention of Appellant's counsel that the dispute here is about a practice that never existed. First of all, that's wrong. Second of all, it's irrelevant. And it's wrong because he's talking about this myopic focus on what happened only in the Kansas City Terminal. And as to the Kansas City Terminal, it is true that the 2017 Supervisor 1E position was the first time there had been a right of selection position since the advent of ITRAC force in 2009. That's correct. But this collective bargaining agreement, like most collective bargaining agreements under the Railway Labor Act, didn't apply to a single location in St. Louis. It applied system-wide. So you look at the collective bargaining agreement that's Exhibit 79. There's a scope rule. There's seniority provisions. And it talks about seniority rosters at the Omaha headquarters. It talks about the Texas district seniority. It talks about the California and Nevada seniority district. It applied throughout the Union Pacific system. And there was unrebutted testimony from Craig Mitchell that since the advent of ITRAC force, he has participated in 40 to 50 of these right of selection diverse interview panels, and that has occurred. It was the first time in Kansas City, but system-wide, Mitchell had been involved in it 40 to 50 times, including during the relevant time period the award of a Supervisor 1E position in Council Bluffs that was actually under Samantha Miller's jurisdiction. So to say that this was the very first time it happened is misleading. But it's also irrelevant because the weighing of that contention, that this was the first time it happened here, is not a job for the court. As long as the court makes the determination that this claim requires the interpretation of a collective bargaining agreement, Rule 11 and the practices that have developed under Rule 11, that's the end of the case. That's something that neither the court nor the jury gets to decide. It goes to arbitration. And the RLA assigns exclusive jurisdiction over those sorts of claims to the National Railroad Adjustment Board or an arbitration panel that the parties establish. You know, I get that that's a jurisdictional thing, and I understand all that, but really the most surprising thing about this to me as a person who's spent my whole life in courtrooms is the timing of this question being raised as forcefully as it was. I mean, does that make any difference at all? Well, it doesn't because you can raise jurisdiction at any time. At any time, and I get that. I mean, this was, no pun intended, a train wreck when you look at how it came to play before this court. I will tell you, Your Honor, I was not trial counsel, but I believe what led to this being raised at the time and in the way it did was really the argument and the questioning that took place at trial. So when you've got counsel trying to impeach the credibility of a witness saying, here's the collective bargaining agreement. It doesn't say bid. It doesn't say anything about ITRAC force. You know, why is that? And he has another witness on the stand, and he's got the application form from the back of the collective bargaining agreement. Nothing about ITRAC force here. So it really, it puts it in stark relief that what we're really talking about here is what does the collective bargaining agreement mean. And that's what he's posed as a purely factual question is, what was the party's practice? And that's just another way of saying, what are the terms of the agreement? A purely factual question is what you see in the Supreme Court's Lingle decision, right? So Lingle was a Section 301 preemption case, but under the Supreme Court's case law, the same standard applies. And that was employee files a workers' comp claim, gets fired for allegedly falsifying that claim, and then brings suit saying that was retaliatory and in violation of the Illinois state workers' comp statute. The Supreme Court says, well, let's look at the elements. The elements are, was the plaintiff discharged or threatened with discharge? And was the intent of that threat or discharge to deter or interfere with the filing of a workers' comp claim? Nothing about that requires the interpretation of a collective bargaining agreement. In this case, if Nancy Avena had filed an application through ITRAC Force and was on that list, and remember there were 10 people in 2017 who used ITRAC Force to apply, and there were five people in 2018 who used ITRAC Force to apply for the position. If she was on that list and wasn't given an interview and wasn't offered the position, then those would be factual questions about what was the motivation and why. But to say we need to determine what the extent of the practice was and whether it applied, that's pure contract interpretation. It's right down the middle of the plate under the Railway Labor Act, and it requires this court to affirm the district court's decision. I think, and I just want to touch very briefly on the district court's ruling, alternative ruling on judgment as a matter of law. And one of the things that still, I think, is at issue here, and it was at issue in the briefs, is there's no age discrimination claim left in this case, or there shouldn't be. The 2017 claim was dismissed on summary judgment as untimely, and the 2018 claim involved a position that was awarded to Cindy Wood, who was older than Ms. Avena. So there's no viable age discrimination claim. So even if you look at, if you get beyond the preclusion preemption argument, as to the age claim, there's nothing left. And as to the other claim, the district court properly concluded that Ms. Avena failed to show that she was similarly situated to the employees who actually did make a proper application using eye track force. She couldn't point to anyone outside of the protected class who was given, who did not apply according to our interpretation of the agreement, and was given consideration for the position. And so because of that, the district court properly concluded that even if she had jurisdiction, that she would have granted judgment as a matter of law. Unless there are other questions, thank you, your honors. Any questions? Seeing none, thank you very much. Thank you. Mr. Myers, you had used all of your time. I'm willing to give you one minute for rebuttal. Oh, I thought I reserved three. You're responsible for watching your own time. I know, but I thought it said 12. Was it 15? Oh, I'm sorry. I apologize, Judge. I misunderstood. I'm sorry. I'll take the minute. One minute. Thank you, your honor. A couple of quick points. Number one, these cases that involve railroads and unions are of absolutely no help to the court. Because those cases presuppose we're in a contract dispute between a railroad and a union. The only issue is, is it a major dispute or a minor dispute? In a case like this, where there's an independent basis for the claim, the question is, is there an interpretation of the contract required? And I still haven't heard how this case could be resolved by an interpretation of the contract. It can't be. It's a purely factual question. Our evidence is there is no way to apply using I-TRAC force. If the jury believes that, they're gone. What they're wanting to say is you have to take as true our evidence that these 15 people applied through I-TRAC. If what Cantrell Robbins said is true, no, they didn't. And that's not evidence the jury is required to believe. It's evidence that the district court and this court is obligated to disregard. Thank you. The court appreciates the argument in briefing. It's been most helpful. The matter is taken under advisement. Do you want to take a break? Judge Kelly, do you want to take a break or do you want to just keep moving? I defer to you. Okay, well, then I'd say we'll call the next case.